## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **ELIZABETH MAGGARD,** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:14cv00041** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | **BY: PAMELA MEADE SARGENT** |
| **Defendant** | ) | **United States Magistrate Judge** |

### *I. Background and Standard of Review*

Plaintiff, Elizabeth Maggard, ("Maggard"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Oral argument has not been requested; therefore, the matter is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

-1-

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Maggard protectively filed an application for DIB on February 15, 2011, alleging disability as of March 23, 2010, due to major depressive disorder, anxiety and panic attacks. (Record, ("R."), at 180, 189, 193.) The claim was denied initially and on reconsideration. (R. at 88-90, 94-96, 99, 103-05, 107-09.) Maggard then requested a hearing before an administrative law judge, ("ALJ"). (R. at 110.) A hearing was held by video conferencing on May 10, 2013, at which Maggard was represented by counsel. (R. at 33-53.)

By decision dated May 24, 2013, the ALJ denied Maggard's claim. (R. at 16-27.) The ALJ found that Maggard met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2014. (R. at 18.) The ALJ also found that Maggard had not engaged in substantial gainful activity since March 23, 2010, her alleged onset date.[1] (R. at 18.) The ALJ found that the medical evidence established that Maggard suffered from severe impairments, namely degenerative disc disease of the lumbar spine; degenerative joint disease of

_____

[1] Therefore, Maggard must show that she became disabled between March 23, 2010, the alleged onset date, and May 24, 2013, the date of the ALJ's decision, in order to be entitled to DIB benefits.

the knees; major depressive disorder; bipolar disorder; generalized anxiety disorder with panic attacks; and personality disorder, not otherwise specified, but he found that Maggard did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.) The ALJ found that Maggard had the residual functional capacity to perform simple, routine, repetitive, low-stress medium work,[2] which did not require more than occasional contact with the public, co-workers and supervisors, decision making and changes in the work setting and that would allow for her to be off-task up to 10 percent of the workday and miss up to one workday per month. (R. at 20.) The ALJ found that Maggard was unable to perform any of her past relevant work. (R. at 26.) Based on Maggard's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ also found that other jobs existed in significant numbers in the national economy that Maggard could perform, including jobs as a cleaner, a packer and a laundry worker. (R. at 26-27.) Thus, the ALJ found that Maggard was not under a disability as defined by the Act, and was not eligible for DIB benefits. (R. at 27.) *See* 20 C.F.R. § 404.1520(g) (2015).

After the ALJ issued his decision, Maggard pursued her administrative appeals, but the Appeals Council denied her request for review. (R. at 1-5.) Maggard then filed this action seeking review of the ALJ's unfavorable decision,

---

[2] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2015).

which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2015). The case is before this court on Maggard's motion for summary judgment filed June 15, 2015, and the Commissioner's motion for summary judgment filed July 17, 2015.

## *II. Facts*[3]

Maggard was born in 1971, (R. at 46), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). Maggard has an associate's degree in police science and a certificate in criminal justice. (R. at 46, 194.) She has past relevant work as a correctional officer and correctional sergeant at Red Onion State Prison, ("Red Onion"). (R. at 37, 46, 49, 194.) She testified at her hearing that she left her job at Red Onion after having a conflict with an inmate. (R. at 37.) Maggard stated that she "kind of lost it, kind of snapped" with an inmate and that she "wanted to hurt [the inmate] bad." (R. at 37.) She also stated that, following the altercation with the inmate, she got into an argument with a major. (R. at 37.) Maggard stated that she was experiencing panic attacks daily at work. (R. at 37.) She stated that she stayed isolated in her house. (R. at 38.) Maggard stated that she was paranoid and would check the house doors, windows and her kids three to four

---

[3] Maggard does not challenge the ALJ's finding with respect to her alleged physical impairments. Therefore, the discussion of the medical evidence will be limited to those records pertaining to Maggard's mental health. Further, the undersigned's consideration of medical records is limited to those pertinent to the relevant time period of March 23, 2010, the alleged onset date, through May 24, 2013, the date of the ALJ's decision. To the extent that medical records pertaining to dates not pertinent to the relevant time period are contained herein, it is for clarity of the record.

times a night. (R. at 39.) She stated that she no longer went to stores because if someone looked at her, she wanted to break their neck. (R. at 42.) She stated that she "was very homicidal." (R. at 42.)

Robert Jackson, a vocational expert, also was present and testified at Maggard's hearing. (R. at 48-52.) Jackson was asked to consider a hypothetical individual of Maggard's age, education and work history, who had no exertional limitations, but who would be limited to simple, routine and repetitive tasks that required no more than occasional interaction with the public or with co-workers. (R. at 49.) Jackson stated that such an individual could not perform any of Maggard's past work. (R. at 49.) He stated that there was a significant number of jobs that existed that such an individual could perform, including jobs as a cleaner, a packer and an inspector. (R. at 49-50.) Jackson was asked to assume the same individual, but who would be limited to performing simple, routine, repetitive medium work that did not require more than occasional decision making and changes in the work setting, that did not require more than occasional interaction with the public or co-workers, that allowed her to be off-task not more than 10 percent of a workday and that allowed her to be absent from the workplace not more than one day a month. (R. at 50.) He stated that there was a significant number of jobs that existed that such an individual could perform, including jobs as a cleaner, a packer and a laundry worker. (R. at 50-51.) Jackson stated that there would be no jobs available should the individual be off-task at least 20 percent of the workday and be absent one to two times per week. (R. at 51.)

In rendering his decision, the ALJ reviewed medical records from Louis Perrott, Ph.D., a state agency psychologist; Howard S. Leizer, Ph.D., a state agency psychologist; Susan S. Helton, L.C.S.W., a licensed clinical social worker; Woodridge Hospital; Dr. Thomas R. Olmsted, M.D.; J. Brook Cuddy, P.M.H.N.P., a psychiatric mental health nurse practitioner; Dr. Martin F. Monahan, M.D.; Dr. Robert T. Strang, Jr., M.D.; and B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist.

On April 30, 2009, Maggard saw Dr. Martin F. Monahan, M.D., for complaints of feeling as if everything was closing in on her. (R. at 281.) She reported that she had no "drive" and that she "snaps" and "flips." (R. at 281.) Dr. Monahan diagnosed panic attacks. (R. at 282.) On June 16, 2009, Dr. Monahan noted that Maggard's panic attacks had worsened, and he referred her to Dr. Olmsted. (R. at 282.) On July 28, 2010, Maggard reported that her feelings of anxiety and panic had decreased, and she had not experienced symptoms of shortness of breath or chest pressure "in awhile." (R. at 279.) On January 25, 2011, Maggard admitted that she had taken Xanax that she received from a friend. (R. at 280.) On October 10, 2011, Dr. Monahan saw Maggard for back pain after sliding on bleachers. (R. at 368.) On January 13, 2012, x-rays of Maggard's lumbar spine showed lumbar spondylosis with disc space narrowing at the L3-L4 level. (R. at 366.) On April 22, 2013, Maggard hurt her back again after carrying a washing machine. (R. at 431.)

On June 29, 2009, Maggard reported to Susan S. Helton, L.C.S.W., a

-6-

licensed clinical social worker, that she did not feel safe at work and that she experienced panic attacks daily. (R. at 272, 274.) She stated that she was hospitalized as an adolescent after talking about being sexually abused by her cousin beginning at age five or six. (R. at 273-74.) Helton diagnosed severe major depressive disorder, single episode, and assessed Maggard's then-current Global Assessment of Functioning, ("GAF"),[4] score at 50,[5] with her highest GAF score being 60[6] within the past year. (R. at 276.) From July through September 2009, Maggard reported anger issues related to sexual abuse, her spouse and work. (R. at 269-71.) By letter dated September 8, 2009, Helton stated that Maggard continued to show symptoms related to depression and anxiety. (R. at 248.) She stated that Maggard continued to have problems related to depressed mood, anxiety, problems with focus and concentration, as well as feelings of powerlessness and helplessness. (R. at 248.) Helton stated that she was unsure of a specific return to work date for Maggard, but anticipated that she would need to be out of work for 30 to 60 days. (R. at 248.) On October 28, 2009, Maggard reported that she felt better and wanted to return to work. (R. at 266.) In December 2009, Maggard reported that, since adjusting her medications, she felt better and had improved mood. (R. at 264-65.) She reported a successful re-entry to work. (R. at 265.)

---

[4] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[5] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

[6] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

-7-

On April 1, 2010, Maggard reported that she had "lost it" at work and that her supervisor suggested that she take some time off "to clear [her] head." (R. at 263.) She stated that this event brought up issues relating to her sexual abuse, and she reported increased anger. (R. at 263.) On May 24, 2010, Helton opined that Maggard could not currently be in a prison environment due to the potential for "encounter situation[s]" that would exacerbate her symptoms. (R. at 284.) She reported that it was unknown when Maggard could return to work. (R. at 284-85.) In response to questions presented to Helton by Ryan T. Gilchrest, a Senior Disability Benefits Specialist, on June 23, 2010, Helton stated that Maggard had been attacked and bitten by an inmate. (R. at 290.) She reported that Maggard experienced rage and fear generalized toward males. (R. at 290.) Helton further noted that Maggard's mood was depressed, and she had high levels of anxiety. (R. at 288.) She deemed Maggard's judgment as fair and her insight as good to fair. (R. at 289.) Helton diagnosed severe major depressive disorder, single episode, and assessed Maggard's then-current GAF score at 45. (R. at 289.) Helton opined that Maggard had an impaired ability to relate to others in a work setting, to understand, remember and carry out instructions, to respond appropriately to supervision and to supervise or manage others. (R. at 290.) She noted that Maggard's symptoms were not stabilized and that Maggard was unable to work. (R. at 291.)

From May through September 2010, Maggard reported anxiety, anger, depressed mood and problems with being out in public. (R. at 255-62, 287-88.)

-8-

From September 2010 to January 2011, Helton repeatedly assessed Maggard's mood as depressed, with an anxious affect; her depression and anxiety ranged from mild to moderate; her irritability level was described as mild; she was oriented with intact thought process; she had no paranoia or delusions; her insight and judgment were good; and she had no suicidal ideation. (R. at 252-55.)

On January 6, 2011, Maggard expressed anger about the lack of parental response that she received concerning her childhood sexual abuse. (R. at 252.) Helton found Maggard's mood depressed with an anxious affect, but an intact thought process; good insight and judgment; and no paranoia, delusions or suicidal ideation. (R. at 252.) During follow-up appointments in February through May 2011, Helton found Maggard's mood depressed with an anxious affect, but Maggard was oriented; her thought process was intact; she had no paranoia or delusions; her insight and judgment were good; and she had no suicidal ideation. (R. at 249-51, 341.) On July 7, 2011, Maggard reported that she had confronted her mother for having allowed her childhood abuse, but her mother reacted in a detached fashion. (R. at 340.) On November 29, 2011, Helton requested that Maggard be admitted for voluntary inpatient treatment based on Maggard's "ongoing deterioration of her ability to function and deal with her issues." (R. at 378.) In the following months, Maggard reported continuing difficulties shopping in stores, as well as symptoms of anxiety and anger. (R. at 380-84, 389-90, 439-42.) Helton found Maggard's mood to be depressed and her affect was anxious; she had intact thought process; good insight and judgment; and no paranoia, delusions or suicidal ideation. (R. at 380-82.)

-9-

On April 2, 2012, Helton completed a work-related mental assessment, indicating that Maggard had mild limitations in her ability to remember locations and work-like procedures; and to understand and remember very short and simple instructions. (R. at 385-87.) She opined that Maggard had moderate limitations in her ability to interact appropriately with the general public; to ask simple questions or request assistance; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and to be aware of normal hazards and take appropriate precautions. (R. at 386-87.) Helton opined that Maggard had serious limitations in her ability to understand and remember detailed instructions; to carry out very short and simple instructions; to make simple work-related decisions; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others. (R. at 385-87.) She opined that Maggard had no useful ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being distracted by them; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to travel in unfamiliar places or use public transportation. (R. at 386-87.) Helton opined that Maggard was unable to sustain any work activity for five days a week, eight hours a day, 52 weeks a year based on depression, anxiety, anger issues and post-traumatic stress disorder, ("PTSD"). (R. at 387.)

-10-

On May 1, 2013, Helton completed a work-related mental assessment, indicating that Maggard had a seriously limited ability to maintain personal appearance and to behave in an emotionally stable manner.[7] (R. at 435-37.) She found that Maggard had no useful ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out complex, detailed and simple instructions, to relate predictably in social situations and to demonstrate reliability. (R. at 435-36.) Helton opined that Maggard would be absent from work more than two days a month. (R. at 437.)

The record shows that Dr. Thomas R. Olmsted, M.D., treated Maggard for major depressive disorder from June 18, 2009, through September 16, 2010. (R. at 303-14, 319.) Dr. Olmsted assessed Maggard's GAF score between 50 and 70[8] during this time. (R. at 303-10, 319.) On December 1, 2009, Dr. Olmsted reported that Maggard looked well. (R. at 304.) Maggard reported that she felt well and that things at work were going well. (R. at 304.) She also reported that her therapy sessions with Helton were going well. (R. at 304.) Dr. Olmstead reported that Maggard was near remission. (R. at 304.) On September 16, 2010, Maggard

_____

[7] Helton noted that Maggard had between a seriously limited and no useful ability to behave in an emotionally stable manner depending on her stress level and triggers. (R. at 436.)

[8] A GAF score of 61-70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well ...." DSM-IV at 32.

-11-

reported that she did not want to return to work and that she was seeking long-term disability. (R. at 319.) Dr. Olmsted diagnosed major depressive disorder and personality disorder, not otherwise specified. (R. at 319.) On September 29, 2010, Dr. Olmsted opined that Maggard's irritability and volatility made direct work with inmates inadvisable. (R. at 292.) He predicted that Maggard would be able to return to her job on January 1, 2011. (R. at 293.) He recommended that Maggard consider alternative work. (R. at 293.)

On December 9, 2010, Maggard saw J. Brook Cuddy, P.M.H.N.P., a psychiatric mental health nurse practitioner with Dr. Olmsted. (R. at 320-21.) Maggard reported that she had experienced panic-related chest tightness, that she was depressed and that she had been "going off" on people in the store. (R. at 320.) Cuddy diagnosed major depressive disorder and personality disorder, not otherwise specified. (R. at 320.) She assessed Maggard's then-current GAF score at 55. (R. at 320.)

On March 24, 2011, Maggard reported to Dr. Olmsted that she was sleeping better and that her symptoms were less overall. (R. at 357.) She stated that she went bowling with her kids and that she was able to get out in public more. (R. at 357.) Dr. Olmsted reported that Maggard was near remission. (R. at 357.) He diagnosed major depressive disorder and personality disorder, not otherwise specified. (R. at 357.) He assessed Maggard's then-current GAF score at 65. (R. at 357.)

-12-

On July 21, 2011, Maggard reported to Helton that her sleep "comes and goes," but overall was "pretty good." (R. at 355.) She stated that her anxiety and panic attacks were well-controlled with Klonopin. (R. at 355.) Cuddy reported that Maggard was somewhat depressed and minimally anxious; she was able to attend normally with adequate concentration; her memory for recent and remote events was intact; she had good insight; and normal judgment. (R. at 355.) Cuddy assessed Maggard's GAF score at 65. (R. at 355.) On October 27, 2011, Maggard reported that she had made some breakthroughs, but was back to frequent sleeping and not wanting to leave her home. (R. at 353.) She reported that she had not been taking Seroquel because it made her sleepy. (R. at 353.) Cuddy found Maggard's thought content logical, with no evidence of a psychotic process; Maggard was able to attend normally with adequate concentration; her recent and remote memory was intact; her insight was good; and her judgment was normal. (R. at 353.) Cuddy diagnosed major depressive disorder and personality disorder, not otherwise specified. (R. at 354.) She assessed Maggard's then-current GAF score at 60. (R. at 354.)

On November 16, 2011, Cuddy opined that Maggard had no restriction of activities of daily living, marked difficulty in maintaining social functioning and that she had deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner. (R. at 347.) Cuddy opined that Maggard had no significant impairment in her ability to understand, remember and carry out short and simple instructions; to make simple work-related decisions; to be aware of normal hazards and take appropriate precautions; and to set realistic

-13-

goals or make plans independently of others. (R. at 348-49.) She opined that Maggard was moderately impaired in her ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to respond appropriately to changes in the work setting; and to travel in unfamiliar places or use public transportation. (R. at 348-49.) Cuddy opined that Maggard was markedly impaired in her ability to work in coordination with and proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of breaks; to interact appropriately with the general public; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 348-49.) Cuddy diagnosed major depressive disorder and assessed her then-current GAF score at 60. (R. at 347.)

On November 17, 2011, Maggard discussed the possibility of inpatient treatment, but she had to plan this hospitalization around her children's schedules. (R. at 351.) Cuddy reported that Maggard's appearance was rather depressed and minimally anxious, while her thought content was logical, with no evidence of a psychotic process. (R. at 352.) Maggard was able to attend normally with adequate

-14-

concentration; her recent and remote memory was intact; her insight was good; and her judgment was normal. (R. at 352.) Cuddy assessed Maggard's then-current GAF score at 58. (R. at 352.)

Maggard voluntarily admitted herself for inpatient treatment at Woodridge Hospital, ("Woodridge"), on November 30, 2011, through December 2, 2011. (R. at 378-79, 420-29.) Maggard expressed concerns about being able to function in a manner that enabled her to adequately care for her children. (R. at 420.) She reported fears of "going off on people" and felt that her impulse control was considerably compromised. (R. at 420.) Maggard reported sleeping "most of the day" and that she was not able to leave her home without feelings of fear and anxiety. (R. at 420.) On the date of discharge, Maggard reported that she felt 100 percent better. (R. at 420.) She stated that she could tell a difference after the first day's dose of new medication, and she denied side effects. (R. at 420.) Maggard's thought process was coherent, her memory was intact, and her insight and judgment were limited. (R. at 421.) Maggard was permitted to leave against medical advice. (R. at 421.) She was diagnosed with major depressive disorder, chronic, severe, without psychotic features; rule out bipolar depression; PTSD; and prescription opiate and benzodiazepine dependence. (R. at 421.) Maggard's GAF score on admission was assessed at 30,[9] and she had a GAF score of 50 upon discharge. (R. at 421.)

_____

[9] A GAF score of 21-30 indicates that an individual's "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment … OR inability to function in almost all areas…." DSM-IV at 32.

-15-

On December 5, 2011, Maggard reported to Helton that the medication changes that were made at Woodridge were helpful. (R. at 359.) Maggard reported that Neurontin helped with pain, helped her not to cry and helped her to feel like interacting and talking. (R. at 359.) She described her mood as "more even" while taking Neurontin. (R. at 359.) Cuddy reported that Maggard's appearance was somewhat depressed and minimally anxious, while her thought content was logical, with no evidence of a psychotic process. (R. at 360.) Maggard was able to attend normally with adequate concentration; her recent and remote memory was intact; her insight was good; and her judgment was normal. (R. at 360.) Cuddy assessed Maggard's then-current GAF score at 60. (R. at 360.) On December 22, 2011, Maggard stated that her mood had improved; she was not as mad and had fewer outbursts; her crying spells had decreased and were less intense; she had more motivation and interest in things; she was getting things accomplished and spending quality time with her children; and she was functioning better, but was still unable to go to stores. (R. at 373.) She stated that she felt the best that she had in a long time. (R. at 373.) Cuddy reported that Maggard's appearance was mildly depressed and minimally anxious, while her thought content was logical, with no evidence of a psychotic process. (R. at 373.) Maggard was able to attend normally with adequate concentration; her recent and remote memory was intact; her insight was good; and her judgment was normal. (R. at 374.) Cuddy assessed Maggard's then-current GAF score at 60. (R. at 374.)

On March 1, 2012, Maggard reported that she was "good to a point." (R. at 370.) She stated that her current medication regimen was working well and that she

-16-

was able to do more, such as cleaning, laundry and not sleeping all day. (R. at 370.) Maggard reported experiencing nightmares about the prison and scenarios from the past. (R. at 370.) She reported that she continued to have some paranoia about the safety of herself and her family. (R. at 370.) Cuddy reported that Maggard's appearance was mildly depressed and anxious, and her thought content was logical, with no evidence of a psychotic process. (R. at 370.) Maggard was able to attend normally with adequate concentration; her recent and remote memory was intact; her insight was good; and her judgment was normal. (R. at 370.) Cuddy assessed Maggard's then-current GAF score at 63. (R. at 371.) On April 26, 2012, Maggard reported that she was "not too good." (R. at 396.) She reported that she was having problems with her ex-husband. (R. at 396.) She stated that she wished he would "disappear off the face of the earth," but added that she "would not do anything, but I've planned it." (R. at 396.) Cuddy reported that Maggard's appearance was moderately depressed and somewhat anxious, while her thought content was logical, with no evidence of a psychotic process. (R. at 396.) Maggard was able to attend normally with adequate concentration; her recent and remote memory was intact; her insight was good; and her judgment was normal. (R. at 397.) Cuddy assessed Maggard's then-current GAF score at 60. (R. at 397.)

On April 6, 2011, Dr. Robert T. Strang, Jr., M.D., saw Maggard for complaints of pain and discomfort in her left knee after hitting it on asphalt. (R. at 402.) Maggard had satisfactory range of motion, and her ligaments were stable. (R. at 402.) X-rays of Maggard's left knee did not reveal a fracture. (R. at 400, 402.)

-17-

Dr. Strang diagnosed possible stress fracture versus torn cartilage of the left knee. (R. at 402.) On April 13, 2011, Dr. Strang saw Maggard for complaints of swelling and soreness in her left knee joint. (R. at 399.) She stated that her knee swells up when she attempts to ride a bicycle. (R. at 399.) Dr. Strang noted no effusion or evidence of stress fracture. (R. at 399.) An MRI of Maggard's left knee showed minimal degenerative changes with a small joint effusion. (R. at 399, 401.) Dr. Strang administered a cortisone injection to Maggard's left knee. (R. at 399.)

On June 3, 2011, Louis Perrott, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Maggard suffered from an affective disorder, an anxiety-related disorder and a personality disorder. (R. at 59-60.) He found that Maggard had mild limitations on her ability to perform her activities of daily living. (R. at 60.) He reported that Maggard had moderate difficulties in her ability to maintain social functioning and to maintain concentration, persistence or pace. (R. at 60.) He opined that Maggard had not experienced any episodes of decompensation of extended duration. (R. at 60.)

That same day, Perrott completed a mental assessment, indicating that Maggard had no significant limitations in her ability to carry out very short and simple instructions; to sustain an ordinary routine without special supervision; to make simple work-related decisions; to ask simple questions or request assistance; to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make

-18-

plans independently of others. (R. at 61-63.) He opined that Maggard was moderately limited in her ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and to respond appropriately to changes in the work setting. (R. at 62-63.)

On September 22, 2011, Howard S. Leizer, Ph.D., a state agency psychologist, completed a PRTF, indicating that Maggard suffered from an affective disorder, an anxiety-related disorder and a personality disorder. (R. at 74-75.) He found that Maggard had moderate limitations on her ability to perform her activities of daily living, to maintain social functioning and to maintain concentration, persistence or pace. (R. at 74.) He opined that Maggard had not experienced any episodes of decompensation of extended duration. (R. at 75.)

That same day, Leizer completed a mental assessment, indicating that Maggard had no significant limitations in her ability to remember locations and

work-like procedures; to understand, remember and carry out very short and simple instructions; to sustain an ordinary routine without special supervision; to make simple work-related decisions; to ask simple questions or request assistance; and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. at 76-78.) He opined that Maggard was moderately limited in her ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 76-77.)

On April 11, 2013, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Maggard at the request of Maggard's attorney. (R. at 446-57.) Maggard reported that she received psychiatric treatment from Dr. Olmsted until she had a "falling out" with him after he accused her of selling her prescription medications. (R. at 449.) Lanthorn noted a letter dated July 2012 from Dr. Olmsted which indicated that Abingdon Physicians would no longer provide services to Maggard due to a noncompliance and diversion of controlled

-20-

substances.[10] (R. at 449.) Lanthorn noted no signs of ongoing psychotic processes or evidence of delusional thinking. (R. at 450.) Maggard described depression and admitted that she had homicidal or injurious fantasies. (R. at 451.) Maggard had a very flat and blunt affect, and her mood was described as somewhat of an agitated depression. (R. at 452.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Maggard obtained a full-scale IQ score of 75, a verbal comprehension score of 78 and a perceptual reasoning sore of 88. (R. at 452-53.) Lanthorn opined that Maggard's psychopathology was serious and included confused thinking, difficulties in logic and concentration and impaired judgment. (R. at 456.) Lanthorn diagnosed major depressive disorder, recurrent, severe; panic disorder without agoraphobia; chronic PTSD; pain disorder associated with both psychological factors and general medical conditions, chronic; social phobia; borderline intellectual functioning; and personality disorder, not otherwise specified, with schizoid features. (R. at 456.) Lanthorn assessed Maggard's then-current GAF score at 50. (R. at 457.)

On April 23, 2013, Lanthorn completed a mental assessment, indicating that Maggard had an unlimited ability to understand, remember and carry out simple instructions. (R. at 416-18.) He opined that Maggard had a satisfactory ability to maintain personal appearance. (R. at 417.) Lanthorn reported that Maggard was seriously limited in her ability to follow work rules, to relate to co-workers, to use judgment, to interact with supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out complex and

---

[10] While Lanthorn references this letter, it is not contained in the record.

detailed instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R, at 416-17.) He opined that Maggard had no useful ability to deal with the public and to deal with work stresses. (R. at 416.) He found that Maggard would be absent from work more than two days a month. (R. at 418.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2015); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2015).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must

consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if he sufficiently explains his rationale and if the record supports his findings.

Maggard argues that the ALJ improperly determined her mental residual functional capacity. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-8.) Maggard does not challenge the ALJ's physical residual functional capacity finding. Maggard must show that she became disabled between March 23, 2010, the alleged onset date, and May 24, 2013, the date of the ALJ's decision, in order to be entitled to DIB benefits.

The ALJ found that Maggard had the residual functional capacity to perform simple, routine, repetitive, low-stress medium work, which did not require more than occasional contact with the public, co-workers and supervisors, decision making and changes in the work setting and that would allow for her to be off-task

-23-

up to 10 percent of the workday and miss up to one workday per month. (R. at 20.)

Maggard argues that the ALJ erred by giving less weight to the opinions of Dr. Olmsted, Cuddy, Helton and Lanthorn. The ALJ noted that he was giving greater weight to the state agency psychologists in determining Maggard's mental residual functional capacity. (R. at 23.) The regulations fully permit an ALJ to rely upon the opinions of the state agency physicians in determining a claimant's residual functional capacity. *See* 20 C.F.R. § 404.1527(e) (2015) (providing for the consideration of opinions of medical and psychological consultants and other nonexamining physicians and psychologists). The ALJ's reliance on the state agency physicians' opinions was appropriate. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) (explaining that the opinion of state agency medical consultants merit significant consideration because they are experts in Social Security disability evaluation).

The ALJ noted that he was giving little weight to Helton's opinion because the limitations she assessed were contradictory to the clinical findings on examination, which showed consistent eye contact, conversational ability and ability to concentrate. (R. at 25.) The ALJ noted that he was giving Lanthorn's opinion limited weight because it was inconsistent with his own findings. (R. at 25.) As noted by the ALJ, Lanthorn found that Maggard had cognitive problems based on poor concentration, decision-making difficulties and problems with focus and memory. (R. at 25, 457.) However, in the same report, Lanthorn reported that Maggard could remember four out of five words after 10 minutes; could complete

-24-

serial 7s; she gave high order and correct interpretations of two out of three proverbs; and could spell the word "world" forward and backward, which showed strong performance in memory, judgment and concentration. (R. at 25, 452.)

The ALJ noted that he was giving limited weight to the opinion of Cuddy. (R. at 24.) The ALJ found that the evidence of record did not support Cuddy's finding that Maggard had "marked" limitation in social functioning. (R. at 24.) The ALJ stated that Maggard was noted as attending basketball and football games, bowling and getting out with her children on occasion. (R. at 24.) The ALJ noted that, while Maggard consistently alleged difficulty in going to the grocery store and socializing, her clinical examination findings included good eye contact and clear and coherent speech and thought. (R. at 24, 352-53, 355, 360, 362-63, 370, 373, 376.)

The record shows that Maggard has been treated for anxiety and depression since 2009. (R. at 281, 304-10.) Throughout 2009 and 2010, Maggard's condition fluctuated, with GAF scores ranging from 50 to 70. (R. at 303-10, 319.) However, in March 2010, Maggard had an episode at work in which she had an anger outburst at one of the prisoners that she was guarding. (R. at 263.) She removed herself from work and pursued short-term disability given the instability of her mental status. (R. at 263.) On July 28, 2010, Maggard reported that her feelings of anxiety and panic had decreased, and she had not experienced symptoms of shortness of breath or chest pressure "in awhile." (R. at 279.) On September 16, 2010, Maggard told Dr. Olmsted that she did not want to return to work and that

-25-

she was seeking long-term disability. (R. at 319.) That same month, Dr. Olmsted reported that Maggard would be able to return to work on January 1, 2011, but recommended that she consider alternative work. (R. at 293.) On March 24, 2011, Maggard reported that she was sleeping better and that her symptoms were less overall. (R. at 357.) She stated that she went bowling with her kids and that she was able to get out in public more. (R. at 357.) Dr. Olmsted reported that Maggard was near remission. (R. at 357.) In July 2011, Maggard reported that, overall, she was doing "pretty good." (R. at 355.) She stated that her anxiety and panic attacks were well-controlled with Klonopin. (R. at 355.) Cuddy reported that Maggard was somewhat depressed and minimally anxious; she was able to attend normally with adequate concentration; her memory for recent and remote events was intact; and she had good insight and normal judgment. (R. at 355.)

Maggard voluntarily admitted herself for inpatient treatment at Woodridge Hospital on November 30, 2011. (R. at 420-29.) On the date of discharge, Maggard reported that she felt 100 percent better and that she could tell a difference after the first day's dose of new medication. (R. at 420.) On December 5, 2011, Maggard reported to Helton that the medication changes that were made at Woodridge were helpful. (R. at 359.) She reported that Neurontin helped with pain, helped her not to cry and helped her to feel like interacting and talking. (R. at 359.) On December 22, 2011, Maggard stated that her mood had improved; she was not as angry and had fewer outbursts; her crying spells had decreased and were less intense; she had more motivation and interest in things; she was getting things accomplished and spending quality time with her children; and she was functioning better. (R. at

-26-

373.) Maggard stated that she felt the best that she had in a long time. (R. at 373.) Cuddy noted that Maggard was able to attend normally with adequate concentration; her recent and remote memory was intact; her insight was good; and her judgment was normal. (R. at 374.) On March 1, 2012, Maggard continued to report that her medication regimen was working well and that she was able to do more. (R. at 370.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). Maggard was able to attend normally with adequate concentration; her recent and remote memory was intact; her insight was good; and her judgment was normal. (R. at 370.)

For all of the reasons stated herein, I find that substantial evidence supports the ALJ's weighing of the medical evidence and the ALJ's finding with regard to Maggard's mental residual functional capacity and his finding that Maggard was not disabled. An appropriate Order and Judgment will be entered.

ENTERED: February 25, 2016.

s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE

-27-